## A. S. MILLER ET AL. V. MARY S. ROGERS ET AL.

1. JUDGMENT.—The omission in a judgment to dispose of the rights of a party plaintiff whose pleadings show that he had no valid claim as against the other plaintiffs, is not a material error.

2. SAME.—The accidental omission in a judgment of the name of a married woman, plaintiff, where her husband was a party, and her rights were recognized in the decree to her husband, is not fatal to the judgment on appeal by defendant.

3. VENDOR AND VENDEE—SALE OF LAND.—Where a deed to land acknowledged the receipt of the purchase-money, and afterwards the vendee executed a mortgage upon the lands to secure the purchase-money: *Held*, That without further explanation the principle announced in Dunlap *v.* Wright, 11 Tex., 597, would not apply so as to prevent the title to the land from passing to the vendee as against the vendor.

4. FRAUDULENT CONVEYANCE—EVIDENCE.—It is not perceived how bankruptcy in 1868, and a discharge in bankruptcy in 1869, could affect a deed made by the bankrupt in 1866 to his children, in alleged consideration for their share in right of their deceased mother to community property used by the grantor.

5. ADMINISTRATOR'S SALE OF PROPERTY NOT INVENTORIED.—An administrator's sale of land which had been sold and paid for in the lifetime of the intestate, and which had not been inventoried, and in the proceedings ordering the sale the vendee was no party, conveys no title as against said vendee.

6. WILL—EVIDENCE.—Where plaintiffs sued for land, claiming as heirs, and the testimony showed that the ancestor made a will, it devolved upon the plaintiffs to show that they were legatees, to entitle them to recover.

7. PLEADING—FORECLOSURE—EQUITY.—An action of trespass to try title was brought by a vendor against a purchaser of parts of several tracts conveyed at the same time; by amendment, the suit was changed into a foreclosure suit on a mortgage, setting out a history of the dealings by the vendee in selling parts of the land incumbered by the mortgage, and of collections and compromises made by the vendor with such purchasers and their vendees; asking judgment for a sum proportional in value to the land sued for, with relation to the entire tracts, and naming a specific sum as such value. Under such state of pleading, a judgment in excess of both such estimated sums, and enforcing the mortgage for such judgment against the tracts sued for, was erroneous.

8. PLEADING—EQUITY.—Where, by the pleadings of the plaintiff to

foreclose, it is shown that other lands were included in the mortgage sought to be foreclosed, and which lands have been sold by the mortgagor, and that plaintiff had settled with some of such purchasers, the equitable rights of such persons, and of others, as affected by such acts, become part of the litigation, as if pleaded in defense, and must be acted upon by the court in adjudging or refusing relief.

9. MORTGAGE OF SEVERAL TRACTS—MARSHALLING SECURITIES.— Where several tracts of land were included in one mortgage, and subsequently the mortgagor sold at different times parts of such mortgaged lands, in enforcing the mortgage against the several tracts the decree should order sale first of that part of the lands owned by the mortgagor, and next the latest tract sold, and so on inversely to date of sales.

10. PURCHASERS OF DISTINCT TRACTS OF MORTGAGED PROPERTY.— The purchaser first in order of time of part of several tracts of land included in a mortgage, is not affected in his right to have the foreclosure sale made in above order by the acts of the mortgagee in compromising with other purchasers, or in suits with them, or any other matters to which he is not a party ; and if the mortgagee has so acted with such other tracts and purchasers that he cannot pursue such first purchaser, and accord to him his rights, such inability will inure to the discharge of such first purchaser; being a loss to the mortgagee by his own fault.

11. PRACTICE—PARTIES.—Plaintiff, in his suit in trespass to try title, was not required to make any other party defendant but the one claiming and holding the land sued for; but upon amending and seeking to enforce his mortgage, it became necessary to make all purchasers of the mortgagor, subsequent to the mortgage, of parcels of the mortgaged lands, parties defendant, so that equities between them, and in the several tracts claimed by each, may be adjusted.

12. QUERE.—Whether any lien exists upon a tract of land under a mortgage, where the land had been sold by the mortgagor to defendant by bond for title recorded, the purchase-money being partly paid, and the tract of land subsequently having been deeded by the mortgagee, May, 1852, and the mortgage being executed in July, 1852?

13. QUERE—LIMITATION.—Whether the acknowledgment of notes secured by mortgage, made by the maker, affected purchasers of lands mortgaged prior to such acknowledgment?

APPEAL from Guadalupe.    Tried below before the Hon. William H. Burgess, special judge.

Petition for trespass to try title to 500 acres of land was filed in the District Court of Guadalupe county September 7, 1869,

by the following plaintiffs, all of Virginia, viz.: Mary Susan Rogers, wife of and joined by Byrd R. Rogers; Ann Eliza Rogers, wife of and joined by John S. Rogers; R. A. Miller and Edward T. Miller, all children and heirs of Edward B. Miller,—against defendants, all of Gonzales county, Texas, Alsey S. Miller; Mollie R. Ramsay, wife of and joined by William Ramsay; William A. H. Miller, Thomas H. Miller, James B. Miller, and Zellah P. Miller, some of whom were minors.

On the 5th of May, 1873, T. M. Harwood, claiming to be the administrator of the estate of E. B. Miller, deceased, intervened in the suit by petition, in which he disclaims any interest in the land, and joins with the original plaintiffs in setting up two species of title in them,—first, by purchase from Herron's administrator; and, secondly, by purchase at sheriff's sale,—both made by Harwood, as they allege, for the benefit of the original plaintiffs. On the 7th of October, 1873, the original plaintiffs and Harwood, the intervenor, again amend, in which, among many other things, they allege, that in order to avoid any question as to who should take the land sued for, (the heirs of E. B. Miller or his administrator,) Harwood had joined in the suit, and pray to prosecute the suit together, and for judgment in their favor for the land, rents, &c.

On the 28th of September, 1874, the plaintiffs and intervenor again amend, setting up in answer to defendants' plea in abatement as to Harwood, administrator, and setting out allegations of facts in the case; and they also, in this amendment, set up that in case their titles to the land are bad, that they are still entitled to recover of the defendants the *pro-rata* share (of this 500 acres of land) of the purchase-money due from Herron to E. B. Miller, and pray for a judgment decreeing the land to be sold for its *pro rata* of the entire balance of the purchase-money, to be ascertained by estimating the entire value of Herron's purchase, or that the court will adopt the amount ($2,000) paid by Miller to Herron as its

*pro-rata* value; and these are the only prayers and allegations asking a sale of the land, and about all of the pleadings that are material in the present attitude of the case.

The defendants first answered by demurrer and plea of not guilty; after Harwood's intervention, they plead in abatement as to him. On the 28th of September, 1874, defendants pleaded the statutes of limitation of three, five, and ten years, to the suit of trespass to try title, and the statute of limitations of four years, and stale demand, to any recovery on the notes and mortgage, and set up facts on which they relied to defeat both actions. October 5, 1874, defendants filed a replication to plaintiffs' last amendment. A jury was waived and the cause submitted to the court, who gave a judgment in favor of part of the original plaintiffs for the whole of the balance due from Herron to E. B. Miller's estate, and decreed the land in controversy to be sold by the sheriff of Gonzales county to satisfy this judgment, leaving out entirely Ann E. Rogers and Harwood, administrator.

It appeared from the testimony that Thomas R. Miller immigrated to Texas about the beginning of the year 1832. On the 11th day of March, 1832, he was married by bond to Sidney Ann E. Gaston. On the 12th day of July, 1833, said Miller and wife, by indorsement on the marriage bond, agreed to separate and hold the bond for naught. One child was born of this marriage, which died about the time of or before their separation. On the 27th of September, 1835, Sidney E. Gaston (or Miller) was married by bond to Benjamin Kellogg, and had one child born to this marriage, who is now living. On the 8th day of August, 1834, Thomas R. Miller made a will, in which he bequeathed a league of land in the forks of the Guadalupe and San Marcos rivers, known as the Moreland league, to two brothers, Edward B. and Richard F. Miller. All the residue of his estate in Texas he bequeathed to Edward B. Miller, Richard F. Miller, and Joseph P. Lalor. Thomas R. Miller was killed at the fall of the Alamo, on the 6th of March, 1836.

26

On the 26th day of May, 1845, Adam Zenneralt made affidavit before J. M. Baker, chief justice of Gonzales county, "that he believed he signed the above instrument as a subscribing witness, and for the purpose therein expressed." And upon this affidavit the will was "ordered of record and on file."

Kellogg died at Harrisburg in 1836, and Mrs. Kellogg, in 1837 or 1838, moved with her child upon the Thomas R. Miller homestead place, and lived there until her death, in 1839, leaving one son, then two or three years old, by Kellogg, who is now alive. Administration was opened upon the estate of Thomas R. Miller in 1838, but nothing done in it after about 1842.

On the 3d day of December, 1851, E. B. Miller, claiming to be sole heir of Thomas R. Miller, conveyed to Andrew Herron, by title bond, all the real estate belonging to the estate of Thomas R. Miller in Texas, embracing 4,375½ acres of land and several town lots in Gonzales county, 4,428 acres in Guadalupe county, and 2,981 acres in Bexar land district, (Gillespie county,) and all other lands that might be recovered by said estate; as a consideration for which conveyance, Herron executed to him three notes, payable in the city of New York: one for $5,725, due January 1, 1852; one for $6,000, due April 1, 1853; and one for $6,000, due April 1, 1854. On the 2d day of February, 1852, Herron conveyed 500 acres out of the Thomas R. Miller homestead league to A. S. Miller, for $2,000, $1,000 being paid in April or May, 1852, and the balance when the deed was made, in 1856.

The title bond from Miller to Herron was not recorded. The title bond from Herron to Miller was recorded on the 9th of March, 1852. On the 24th day of May, 1852, E. B. Miller executed and delivered to Herron a deed to the lands described in the title bond of date December 3, 1851, in which he recites full payment of the purchase-money, which deed was recorded in Gonzales county on the 7th day of April, 1854.

On the 16th day of July, 1852, Andrew Herron executed and delivered to E. B. Miller a mortgage to secure the payment of these notes, which are of the same date and amounts and same description as those described in the title bond, except that the notes which are set out in the mortgage are not payable in New York, and do not show that they were given for the purchase-money of land. This mortgage was recorded in the county of Gonzales on the 28th of July, 1852, and reacknowledged (to prevent the running of the statute of limitations) and recorded on the 5th of February, 1855.

E. B. Miller died in the year 1852, leaving a will, which was regularly probated in Virginia, and in Guadalupe county, Texas, by which he appointed Francis T. Wooten and Thomas Clark executors of his will and testamentary guardians of his children, who are, with their husbands, plaintiffs in this suit. In 1854, these executors and Ann E. Miller, now Ann E. Rogers, executed to Hunter H. Marshall, a lawyer of Virginia, a power of attorney, authorizing him to come to Texas, settle and compromise the debt due to their estate from Herron, and to administer upon the estate of E. B. Miller in Texas. Marshall came to Texas in December, 1854, and saw Herron, who told him he had sold a portion of the mortgaged lands to William Means, and that Means was to pay his debt to Miller's estate. It seems that Means had sold the lands, at a still further advance, to the Smiths and Brodnax. A meeting was appointed at Gonzales, at which were present Marshall and his attorney, Judge Thornton, Means, Weimbish, Brodnax, and Captain and Doctor Smith, (Herron not being present,) when, it seems, Hunter had obtained from Herron or Means the notes given to Means by these other parties, which Hunter delivered up and took new notes, of date December 13, 1854, and at which time he executed and delivered to Means a document evidencing their settlement, providing that when certain notes therein described should be paid, credits therefor to be enter-

ed on the original debt.   By this arrangement, it seems that Marshall, in order to better secure his debt and to get ten per centum interest on the money, took from Means notes and money to the amount of five-sixths of the debt due from Herron to Miller, amounting in all to $16,381.96, as scaled and reduced, as of date December 13, 1854,—the debt and interest from Herron to Miller amounting to $19,658.35, according to Marshall's estimate at that time.   Soon after this the Smiths paid off their notes, amounting to over $3,150, and afterwards Weimbish paid his notes, amounting to $1,775.62 and interest to date of payment, but which was scaled at $1,591.68, and cash, $50, paid by Means, making total payment $4,975.62, without the ten per centum interest, but as scaled by Marshall's agreement amounting to $4,791.68. There is no evidence that Herron had any notice of what was done at this meeting, further than that he was present at Seguin when Means paid the $50 and gave his note for $3,012, and assented to that.

On the 16th of January, 1856, Herron conveyed by deed to Alsey S. Miller the land described in the title bond of February 2, 1852, and at that time A. S. Miller paid the balance of the purchase-money due to Herron on the land in controversy.

On the 22d of December, 1857, Wooten and Clark, executors of Thomas R. Miller, assigned and transferred to Byrd R. Rogers the two notes on Brodnax, without recourse on them.   The note on Means for $3,012 was assigned by them to Rogers in the same way, without date, and the presumption is that it was done before January 1, 1856, the time when the note matured.

Herron died during the war, and on the 17th of March, 1866, P. L. Herron appears to be acting as his administrator, but there is no evidence of his appointment or qualification.

On the 2d of October, 1866, Alsey S. Miller conveyed the land in controversy to his children, in consideration of the community interest of their mother in another tract of land

and other property previously sold by him,—the land in controversy being also community of said Miller and his deceased wife.

On the 26th of October, 1866, Byrd R. Rogers, assignee of the Brodnax notes, compromised with Brodnax, and the compromise was made the judgment of the court, in which the amount of the two notes and interest was placed at $19,238.60, in which it was stipulated that Brodnax should retain the land for which the notes were given until January 1, 1869, and that if within that time he paid two-thirds of the amount found to be due, with ten per centum interest from that time, he was to have the land; otherwise it was to be vested in Rogers.

At the January Term, 1868, of the Probate Court of Guadalupe county, T. M. Harwood, as administrator of E. B. Miller, obtained an order to sell the land described in the mortgage from Herron to Miller, from which it appears that there had been a previous order of sale of same lands. This order directs the lands to be sold for cash; that in Guadalupe county on the first Tuesday in March, 1868; that in Gonzales county on the first Tuesday in April, 1868; and that in Gillespie county on the first Tuesday in May, 1868. P. L. Herron made his reports of sale, showing that the lands in Guadalupe county were sold to T. M. Harwood, administrator of E. B. Miller, for the sum of $5,440; that in Gonzales county to the same party for $10,465, which sales were confirmed by the court; and that in Gillespie county to same party for $1,000.

*Miller & Sayers*, for appellants.

I. We hold that the judgment was contrary to law, there being no pleadings, no prayer authorizing it.

II. Again, the judgment of the court was contrary to law, in holding that there had been any lawful sale of any part of the land included in the mortgage, under the order of the Probate Court of Guadalupe county, made January 29, 1868, so

as to arrive at and fix the balance due after deducting such sales.

1. Because the lands in Gonzales county had never been inventoried and appraised. Our Probate acts, in force at that time and now, seem clearly to require an inventory and appraisement, before any other action can be taken in relation to the property of estates. (Paschal's Dig., arts. 1298, 1299, 1300, 1301, 1304, 1305, 1306.)

2. Because the sale was ordered to be made without any written petition being filed for it, and without service of notice upon the administrator. (Paschal's Dig., art. 1319.) If the record does not show that the written petition was filed and notice served, the court had no jurisdiction to order the sale. (Finch v. Edmonson, 9 Tex., 504; Miller v. Miller, 10 Tex., 333; Littlefield v. Tinsley, 26 Tex., 356; Withers v. Patterson, 27 Tex., 496, 497; 31 Tex., 91; 25 Tex. Supp., 136.)

3. Because the evidence discloses the fact that all the homestead three-fourths league and the Lalor quarter had been sold by Herron in his lifetime, and that the equity of redemption was held by others. (Buchanan v. Monroe, 22 Tex., 542; Hall v. Hall, 11 Tex., 526; Hall v. Harris, 11 Tex., 300.)

4. The plaintiffs having foreclosed their mortgage and purchased such title as the decedent Andrew Herron had, (Love v. Berry, 22 Tex., 377,) were not entitled to a second foreclosure in an action of trespass to try title. (Paschal's Dig., art. 5292; Lynch v. Baxter, 4 Tex., 437; Edmonson v. Hart, 9 Tex., 554.)

III. In making judicial sales, parties are not permitted by law to practice fraud. (Crayton v. Munger, 9 Tex., 289; Walton v. Reager, 20 Tex., 109; Hawpe v. Smith, 25 Tex. Supp., 451.)

No purchase-money was paid, which was a badge of fraud, (Thompson v. Shannon, 9 Tex., 536,) the administrator taking upon himself the right to distribute the funds of an insolvent estate.

There is no evidence that the lands in Guadalupe and Gillespie counties, and part of those in Gonzales, had been sold by Herron; and these lands must have been first exhausted before resorting to those that Herron had conveyed. (2 Story's Eq., sec. 1233; Rorer on Judicial Sales, sec. 195, p. 81.)

But defendants were also the first purchasers from Herron, and entitled to have all the other land exhausted before resorting to theirs. (Rorer on Judicial Sales, secs. 195, 196, 197.) Judge Story, in the section before quoted, holds a different opinion; but we think the best authorities sustain the foregoing authority.

These sales, as to the land which Herron had previously sold, were also illegal, because the purchasers of the equity of redemption were not made parties to the decree of foreclosure. (Buchanan *v.* Monroe, 22 Tex., 537; Haines *v.* Beach, 3 Johns. Ch., 459.)

The lands in the homestead league and the Lalor quarter had been divided up into different tracts, and were held by different interests and different parties, yet they were sold in bulk; and the three separate tracts in Gillespie county were all sold together at one time. This was all clearly illegal and void. (Ballard *v.* Anderson, 18 Tex., 377; Tiernan *v.* Wilson, 6 Johns. Ch., 412; Brightman *v.* Reeves, 21 Tex., 70; Wheeler *v.* Newbould, 16 N. Y., 392; 7 Allen, 23; 40 Barb., 279; 12 Minn., 232.) * * *

But if it be held that the assignment and transfer of the collateral notes did not compel plaintiffs to allow them as a credit on the original debt, we think that the taking the compromise judgment on the Brodnax notes was such a manifest appropriation as would compel them to allow the amount stipulated in the agreement with Hunter Marshall as a credit on the notes and mortgage. Suppose the day after the rendition of that judgment Herron's administrator or heirs had come in to pay up the Herron notes and receive back the collaterals, would they have been compelled to receive back

that judgment instead of the notes? On the contrary, justice and fair dealing would require the plaintiffs to keep their judgment, and only receive payment of the balance due after deducting the amount agreed to be credited as of 13th December, 1854. (Bowman *v.* Wood, 15 Mass., 534; Garlick *v.* James, 12 Johns., (N. Y.,) 146; Depuy *v.* Clark, 12 Ind., 432; Diller *v.* Brubaker, 52 Penn., 498; Carleyon *v.* Lansing, 2 Caine's Cases; 57 Penn., 474; 3 Duer, (N. Y.,) 660.)

IV. We also believe that plaintiffs' claims are barred by limitation of time. The evidence shows that the defendants have had peaceable adverse possession of the land from January 1, 1852, up to the commencement of this suit, September 7, 1869. The first note was due January 1, 1851, and was barred January 1, 1856. The second note was due April 1, 1853, and was barred April 1, 1857. The third note was due April 1, 1854, and was barred April 1, 1858. The re-acknowledgment of the mortgage by Andrew Herron, in 1854, could not have any effect upon them, one way or the other. Can the subsequent acknowledgment, secretly made by Herron, have the effect to revive the lien on the land in controversy, when he had no title to it, nor lien upon it, and when he could not have bound the land by mortgage, sale, or any other mode of conveyance?

The mortgage is but an incident of the debt, and is barred, when the debt is barred; (Duty *v.* Graham, 12 Tex., 427;) and, as between the original parties, when the debt is revived by a new promise, the mortgage is also revived. (Perkins *v.* Sterne, 23 Tex., 561.)

The mortgagor still holds the equity of redemption, which is tantamount to the fee in land, and which he can alienate by deed; (Buchanan *v.* Monroe, 22 Tex., 542; 12 Tex., 44;) and having alienated by deed, or other conveyance, it seems absurd to say, that by reviving a debt barred by limitation, which is a new contract, (27 Tex., 119,) he can create an incumbrance upon property in which he has no shadow of interest. (Paschal's Dig., arts. 4622, 4623, 4624; Glasscock

*v.* Nelson, 26 Tex., 151; Hunter *v.* Hubbard, 26 Tex., 548; Fullerton *v.* Spring *et al.,* 3 Wis., 667; 23 Grat., 200, 212.)

When Miller went into possession of the land in 1852, he certainly held it adversely to everybody except his immediate vendor, and when he placed the title bond on record in March, 1852, it was notice of his claim. If his possession was not adverse to plaintiffs', it certainly became so when plaintiffs' intestate executed the deed to Herron on the 24th of May, 1852, acknowledging payment of the purchase-money. (Paschal's Dig., arts. 4989, 997; 25 Tex., 131, 156; 17 Tex., 15, 27; 4 Tex., 165; 27 Tex., 67; 21 Tex., 132.)

V. The court seems to determine the liability of the land to be sold under the mortgage from the fact that A. S. Miller bought the land with notice of the vendor's lien.

Now, there was no vendor's lien, strictly speaking, at the time of the sale from E. B. Miller to Herron; the instrument of title executed by E. B. Miller being the title bond of December 3, 1851, in which he obligates himself to make a deed upon payment of the purchase-money. The vendor's lien can only exist by implication of law, and not by contract. (Wynn *v.* Flannegan, 25 Tex., 781; White *et al. v.* Downs, 40 Tex., 231, 232; 25 Tex., 131, 132.)

There being, then, no vendor's lien in this case at the time Miller purchased, he could have no notice of that which did not exist. The vendor's lien in this case arose at the time of the execution and delivery of the deed from E. B. Miller to Herron, of date the 24th of May, 1852, in which payment of the purchase-money is acknowledged, and which was in satisfaction of the title bond. But if this vendor's lien could relate back to and affect A. S. Miller, who bought the land in controversy nearly four months before this lien came into existence, we think the authorities are clear that this vendor's lien was waived and annulled by taking the mortgage on the 16th day of July, 1852, long after the execution of the deed, and not reciting that the mortgage or notes were for purchase-money of the land. (McDonough *v.* Cross, 40 Tex., 286;

Mackreth v. Symmons, 1 Lead. Cases in Eq., 370; notes of American editor, and cases there cited, in which it is laid down as the general rule, that taking a mortgage upon the land sold for a part or the whole of the purchase-money, is a waiver of the implied lien, unless it is expressly stipulated that it shall be retained.)

If the vendor's lien was not waived by taking the mortgage, then there can be no question that it was waived by taking the collateral notes of Brodnax and others on the 15th of December, 1854, and the ten per cent. interest on those collateral notes. (Parker County v. Sewell, 24 Tex., 238; 13 Tex., 463; Griffin v. Blanchar, 17 Cal., 70; Truebody v. Jacobson, 2 Cal., 82, 269; Delassas v. Porter, 19 Miss., 525; Tiernan v. Thurman, 14 B. Monr., 224; 32 Barb., 92; 14 Ind., 439; 4 Minn., 65; 21 Md., 307; 17 Ohio, 500; 3 Long on Vend., 123; Tiernan v. Wilson, 6 Johns. Ch., 412.)

It is true, that there are some decisions of our own court in which it is held that the taking a mortgage upon the land is not a release of the vendor's lien. (Wasson v. Davis, 34 Tex., 159.) But an examination of all this class of cases will show that there was an express lien reserved in the deed, or that the deed to the land and the mortgage were executed at the same time, and are construed as one instrument, upon the authority of Dunlap's Administrator v. Wright, and Estes v. Browning.

VI. The will of Thomas R. Miller recites the fact that his devisees, E. B. and R. F. Miller, were citizens of the United States of the North. The conveyances to E. B. Miller show that they continued to reside in Virginia. H. H. Marshall's evidence shows the same facts; hence, at the time of the death of Thomas R. Miller (at the fall of the Alamo, March 6, 1836) they were aliens, and under the laws then in force could not take the estate by the will nor by descent. (Holliman v. Peebles, 1 Tex., 710; Hornsby v. Bacon, 20 Tex., 556; Middleton v. McGrew, 23 How., 48, 49; 10 Tex., 168; 20 Tex., 568; 26 Tex., 24, 450.)

*Harwood, Conway & Winston,* for appellees, discussed carefully the pleadings and testimony.

ROBERTS, CHIEF JUSTICE.—The case was submitted to the court without a jury, and judgment was rendered that there was $20,477.32 due to plaintiffs, as heirs of E. B. Miller, on the notes secured in the mortgage executed by Herron to E. B. Miller, and that the 500 acres of land sold by Herron to A. S. Miller should be sold to pay the same, by virtue of the mortgage. From this judgment the defendants appealed.

The record contains a statement of facts, and one exception to the evidence, as to a sale of land in Gillespie county after the judgment had been pronounced.

1st. This judgment, as rendered by the court, leaves out of the case Thomas M. Harwood, administrator of the estate of E. B. Miller, it may be, on two grounds: first, that he had no interest, as shown by his own pleadings, and was an unnecessary party; and, second, that his administration in Gonzales county was without jurisdiction, and unnecessary, as shown by his pleadings.

2d. It leaves out the name of Ann E. Rogers, wife of John S. Rogers, as it may be presumed, by clerical mistake, her husband's name being included in the judgment as one of the plaintiffs.

3d. It disregards the claim of superior legal title to the land set up by the plaintiffs, upon which they sought to recover the land in the original and amended petitions.

The grounds for this claim of title may be noticed under three heads.

1st. That A. S. Miller held only a bond for title from Herron, executed in January, 1852, and recorded about the same time, who, when he executed it, had only a bond for title from E. B. Miller, executed in December, 1851, and never recorded; that E. B. Miller executed a deed to Herron for this, and a large amount of other lands, in May, 1852, and on June 16, 1852, took up his bond, and on the 16th of July, 1852, took

a mortgage back of all of the same lands for the payment of the three notes, the same in amount (about $17,000) as. originally given for the land. The mortgage was recorded in 1852, and notes acknowledged twice afterwards, the last time in 1858. The deed was recorded in 1854. The petition alleges that the deed and mortgage were executed at the same time; but there is no evidence to fully explain the difference in the dates of the deed executed in May, 1852, and the mortgage executed on the 16th of July, 1852, without which the rule in Dunlap *v.* Wright, 11 Tex., 600, and subsequent cases following it, would not apply, so as to prevent the deed from E. B. Miller to Herron, in May, 1852, from conveying the legal title, and divesting it out of E. B. Miller.

2d. A title by sheriff's deed, dated the 4th of February, 1868, to Thomas M. Harwood, for the benefit of the E. B. Miller heirs, sold as the property of A. S. Miller, under execution issued upon a judgment rendered against him on the 22d of October, 1866, which land was released to the said E. B. Miller's heirs, by Thomas M. Harwood, by deed.

The defense set up to this was a transfer by A. S. Miller to his children, the other defendants, of the land in controversy, by deed of the 2d of October, 1866, in consideration in part of their interest in their deceased mother's community estate.

And to this the plaintiff replied, that the deed was voluntary, and made in fraud of his creditors. Upon this issue there was much proof adduced on both sides, so as to make a decided conflict of evidence. To this title under the sheriff's deed, the defendants also set up the bankruptcy of A. S. Miller, he being alleged to have been adjudged a bankrupt on the 29th of February, 1868, and discharged on the 4th of February, 1869. It is not perceived how this plea of bankruptcy could defeat a title perfected on the 4th of February, 1868, by sheriff's deed.

3d. A title by purchase of Thomas M. Harwood, for the benefit of E. B. Miller's heirs, at administrator's sale, under a foreclosure of the mortgage executed by Herron to E. B.

Miller, by the Probate Court of Guadalupe county, acting upon the estate of Andrew Herron, in 1868.

The objections made to this title, are that Herron had sold and been paid for this land long before his death; it was not inventoried as part of his estate; and neither A. S. Miller nor his vendees, his children, had notice of and were not parties to the proceeding for foreclosure, and are not bound by it, and, as against them, it vested no title to the land in Harwood, or in E. B. Miller's heirs, when the land was sold under it. (Buchanan *v.* Monroe, 22 Tex., 537; and subsequent case of Byler *v.* Johnson, 45 Tex., 509, and others.)

There may be also an objection, as it appears from the record here, to all of these grounds of claim of title to the land by the plaintiffs, as heirs of E. B. Miller, that it appears in the pleadings and evidence that E. B. Miller made a will, which was probated in Virginia, and that letters of administration with the will annexed were taken out by H. H. Marshall, and the will was recorded in Guadalupe county, in Texas, and it is nowhere shown that plaintiffs were devisees of this land.

This defect in the proofs, unexplained, might equally be an objection to a recovery on the mortgage hereafter referred to and considered.

4th. The judgment, as rendered, is based upon the right, adjudged to have been established upon the trial, of the plaintiffs, as heirs of E. B. Miller, under whom all parties claim, to enforce the mortgage executed by Herron to E. B. Miller on the 16th of July, 1852, upon about 11,000 acres of land, in different tracts, to recover the balance of the three notes (of about $17,000) secured by said mortgage, still due from the estate of the mortgagor, Andrew Herron, and to subject this tract of 500 acres, as part of the mortgaged lands, to the payment of said balance.

If this had been the only tract of land included in the mortgage, there would be less difficulty presented in the case. But, instead of that, Herron sold this tract, first of all, to A. S. Miller, and afterwards sold a large tract off of the same grant

to William Means, and he, said Means, sold part of it to the Smiths and to Brodnax. And by the evidence we find that other tracts had been sold to White and other persons; and it is not rendered very certain what tracts had been sold by Herron before his death. Some of the land so sold was paid for to the plaintiffs, and there were compromises about other portions of the land, and some of it was taken back. A part of the land was sold in 1868, under the administration of Herron's estate, and bought in for the plaintiffs by Harwood. It is certain, therefore, that at the time this suit was brought for the recovery of the land, in 1869, and by an amendment of the petition alternatively to foreclose the mortgage, filed on the 5th day of May, 1873, there were a number of persons occupying and claiming under plaintiffs, directly or indirectly through Herron, large portions of the mortgaged lands, and other large portions of it had been obtained, by compromise and by purchase, by the plaintiffs, through Thomas M. Harwood.

Neither the administrator nor any of those persons so claiming and holding such lands were made parties to this suit of foreclosure, although the fact of there being such claimants was set up by the pleadings of both sides, in their allegations, showing how the lands had been disposed of by Herron, and the administrator of his estate, and by others who had acquired interests in them.

The assignments of error have reference to such errors of law, relating to the suit as a foreclosure of the mortgage, as were believed to have been committed by the court in arriving at such a determination as that which is exhibited in the judgment rendered, concluding with the general assignment, that "the judgment of the court was contrary to the law and evidence in the case."

Under this assignment may be considered the main question in the case as it was decided. The amended petition, in setting out a cause of action upon the mortgage, and in showing that there was still an amount of money due on the

notes secured by it, stated fully the facts, exhibiting the whole history of this transaction, embracing the matters that have just been referred to; and in seeking a foreclosure of the mortgage on the 500 acres of land originally sued for, concluded by praying for a "judgment against said defendants for the *pro-rata* value of said land, taking the said original mortgage from said A. Herron to the said E. B. Miller for the basis, and estimating from it the amount due, with interest, of the purchase-money of the land in controversy"; or that judgment be rendered for $2,000, with eight per cent. interest, taking the sale from Herron to A. S. Miller as the basis; and for a decree for "the sale of said land, as under execution, to satisfy the judgment so ascertained."

The defendants, in answer to this, pleaded that the plaintiffs had already received amounts, by collections, compromises, and sales of the land, stating them, sufficient to satisfy the whole of the debt secured by the mortgage, and that therefore this land should not be sold at all. What plaintiffs prayed for, if this issue should be found for them, was either an amount (with interest) equal to the value of the 500 acres, compared to the value of the whole of the land included in the mortgage, which, supposing the land to have been sold by the acre, would be about $770 and interest, there having been 11,369 acres sold for $17,625; or $2,000 and interest, the amount of the price paid by A. S. Miller to Herron.

Upon neither basis, in estimating the amount for which plaintiffs sought to render this tract of land liable under the mortgage, could the amount of $20,477.32, for which the judgment was rendered, be reached. By such a judgment, the plaintiffs subjected the land to the payment of a greater amount than they prayed for, and the defendants were placed in a position of not being able to redeem the land, without · paying more than plaintiffs claimed it to be liable for, if not greatly more than it was worth.

This, upon the theory upon which the case was tried, under

the amended petition of plaintiffs, seeking a foreclosure of the mortgage, was erroneous.

5th. If plaintiffs, under their prayer for general relief, were entitled to recover whatever amount might be due them, and subject this land to the payment of it, notwithstanding their prayer for a smaller amount, then it may be said that the manner in which the amount adjudged was found, according to the evidence upon which it was predicated, was not correct, in reference to the equitable rights of the defendants. In considering this proposition, it is proper to premise, that ordinarily, when in a suit land is shown to have been mortgaged to secure a debt, it must be held liable to be sold for the payment of such debt, or of so much of it as remains unpaid when the suit is brought; and if there is any reason why it should not be made subject, or subject only upon conditions or with qualifications, such reasons should be set up in the pleadings of the defendant. If, however, the plaintiff, in stating his cause of action, states facts showing that the land sought to be charged by the foreclosure had been sold by the mortgagor, that other lands were likewise embraced in the mortgage, some of which had been sold by the mortgagor to other parties and some not, then the plaintiff, by his own pleadings, has brought into operation rules of equity which may make his rights dependent upon an adjustment of the relative rights and obligations of others who hold portions of the mortgaged property, the same as though such facts had been set up in defense by the defendant; and must be regarded, on the trial of the case, in connection with such other facts pertinent thereto, or issues made upon them, as may be set up by the defendant in his pleadings. (Ayres *v.* Cayce, 10 Tex., 108.)

Such additional facts were set out in the plaintiffs' amended petition, and such other additional facts pertinent thereto were set out in the answer of the defendants in this case.

Citing the above case for authority, it was said in the case of Wright *v.* Wooters, that "if there was a mortgage duly

recorded, but including other tracts of land, and if that mortgage is still in force, not waived or released, certainly the plaintiffs are entitled to enforce it; but the defendant may claim, unless good reason be shown why the same should not be done, that the other mortgaged lands be subjected also, or that the land in his hands be subjected only to its proper proportionate amount." (46 Tex., 383.)

Another rule of equity is, that where a part of the lands are still in the hands of the mortgagor, they should be sold first before those sold by him are resorted to in a suit to foreclose the mortgage, all of the parties holding any of such lands being properly made parties to the suit. (Ayres *v.* Cayce, 10 Tex., 108.) And, further, it has often been held, with some conflict of authority, that, as between different parties who purchased land from the mortgagor before such suit, the lands of the last purchasers shall be successively and inversely resorted to before the lands of the preceding purchasers, and that the priority of the liability of the respective tracts of land should be settled in the decree of foreclosure, all of the interested parties being brought into court in the same suit for that purpose. (Rorer on Judicial Sales, secs. 195, 196, 197; 2 Story's Eq. Jur., sec. 1233, and cases cited by each.)

If plaintiffs had brought a suit to foreclose the mortgage in the District Court of Guadalupe county, before any payment by Smith and compromises with Brodnax, Smith, and White, and had made Herron, A. S. Miller, William Means, Smith, Brodnax, White, and other purchasers from Herron, or others, if any, parties to the suit, then a decree might have been rendered, subjecting all of the mortgaged lands to the payment of the debt secured by it, which, according to rules in equity that have been announced, would have required the lands to be sold in the order indicated by them, to wit: first, those held by Herron in Gonzales county, (88½ acres,) and in Guadalupe and Gillespie counties; (7,342 acres;) then those sold to Means, and by him to others, (about, as supposed from what appears in evidence, 3,793 acres,) making in

all, approximately, 10,869 acres; and last of all, the 500 acres
first sold to A. S. Miller, which should not have been sold at
all, if, as most likely would have been the case, the preced-
ing sales would have amounted to enough to pay the debts,
and costs of the suit. That being the proper course to have
been pursued with reference to the equitable rights of A. S.
Miller, and plaintiffs having neglected to pursue it, but hav-
ing adopted a different one, they should not be allowed in
this suit to subject this land, sold to A. S. Miller, to be sold
otherwise than by giving him equal advantages, and prefer-
ence of exemption, as if the proper course had been pursued.
Any other rule would not only be inequitable in itself, but it
would be putting him or his vendees to a prejudice with-
out their fault, by the fault of the plaintiffs. And if that
cannot now be done, and be shown with reasonable cer-
tainty to be done, by any mode that may be adopted in this
suit, then the plaintiffs, it would seem, have placed them-
selves in a position to be beyond any relief in a court of
equity as to this land. We have been cited to no authority
pointing out how this can be done without a sale of the
whole of the land. It is very evident that the sale made by
the administrator of A. Herron, in 1868, of all of the land, did
not bind A. S. Miller or his vendees, because they were not
parties to the foreclosure of the mortgage in the Probate
Court.

Nor are he or they bound by the sales of the lands of Smith,
Brodnax, and White under said foreclosure, because they were
not bound by it, not being parties to it. (Rorer on Judicial
Sales, sec. 199; Preston v. Breedlove, 45 Tex., 47; Byler v.
Johnson, 45 Tex., 509.) The defendants were not bound by
the compromises made with Brodnax, White, and Smith.
It was not shown on the trial that the lands in Guadalupe
and Gillespie counties brought a fair price at said sale, and
it is certain that those in Gonzales did not sell for nearly as
much as they had been sold for previously; and it is not

shown how White became the owner of part of the Gonzales land, or what amount or to whom he had paid for it.

Notwithstanding all these things, said probate sale, and the said private arrangements made by the plaintiffs with others, were made the basis of estimating the amounts that should be credited upon the debt secured by the mortgage, and the amount still due for which defendants' land was held liable under the mortgage.

Without going into a more minute examination of this subject, it will suffice to say, that it has not been made apparent on the trial that these transactions have placed the defendants in a position of equal advantage, as if the regular and usual mode of foreclosing a mortgage, where other persons than the mortgagor and mortgagee have acquired rights in the property mortgaged, had been pursued. In such a case, it has been well established, by the authorities previously cited, that suit for foreclosure of the mortgage should be brought in a court competent to adjust all of the equities; and all of the parties having such interests should be included in the same suit. If plaintiffs had relied upon their legal right to maintain the suit of trespass to try the title to the land as originally brought in 1869, no other parties than the defendants need have been made, so far as the plaintiffs were concerned; but when plaintiffs chose to turn it into a suit for the foreclosure of the mortgage, by the amended petition filed in 1873, which, so far as that remedy was concerned, was an abandonment of the validity of the previous foreclosure in the Probate Court of Guadalupe county, we see no good reason why the well-established rule should not then have been followed, by making the administrator of Herron, and all other parties who had then acquired any rights in the mortgaged lands, parties to this suit, so as to have had the defendants' rights settled, in reference to theirs as well as in reference to the rights of the plaintiffs.

There are other questions presented by the special assign-

ments which would require serious consideration, if it were necessary now to decide them.

One of them is, whether or not any lien exists upon this land under the mortgage, as the facts are presented in this record, the land having been sold by Herron to A. S. Miller by bond for title recorded, and the purchase-money being partly paid; this, with the other lands, having been deeded afterwards by E. B. Miller to Herron, and several months afterwards mortgaged by Herron to E. B. Miller?

Another one is, whether or not the acknowledgment, in writing, of Herron of the notes, in 1854 and 1858, and the acknowledgment and approval of them afterwards, as valid claims against the estate of Andrew Herron, will have the effect to prevent the statute of limitation from running against the notes as to A. S. Miller, he having acquired the legal title and paid the purchase-money, subject to the mortgage as it existed in 1856, and this suit to foreclose the mortgage on this land, in satisfaction of said notes, being instituted by the amended petition in May, 1873?

Without deeming it necessary to refer to any other questions, we hold that the judgment as rendered is not responsive to the remedy as sought by the plaintiffs in their suit to foreclose the mortgage, and the evidence on the trial was not adapted to said remedy as sought, nor capable of sustaining it as it was set out and prayed for in plaintiffs' amended petition; and for this error the judgment is reversed and the cause remanded.

REVERSED AND REMANDED.